UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

DAVID DOYLE WILLIAMS,               )
                                    )
       *Plaintiff*,                 )
                                    )        Civ. No. 2:12-cv-430
v.                                  )
                                    )        *Mattice / Lee*
COMMISSIONER OF SOCIAL SECURITY,    )
                                    )
       *Defendant*.                 )

## REPORT AND RECOMMENDATION

Plaintiff David Doyle Williams brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying him disability insurance benefits ("DIB") and supplemental security income ("SSI"). Plaintiff has moved for judgment on the pleadings and Defendant has moved for summary judgment [Docs. 11 & 13]. Plaintiff alleges the Administrative Law Judge ("ALJ") did not adequately consider the opinions of Plaintiff's treating and examining physicians, did not rely on a hypothetical question posed to the vocational expert ("VE") which incorporated all of Plaintiff's limitations, and did not comply with the Appeals Council directions on remand, which related to opinion evidence, the residual functional capacity ("RFC") determination, and VE testimony. For the reasons stated below, I **RECOMMEND** that (1) Plaintiff's motion for judgment on the pleadings [Doc. 11] be **DENIED**; (2) the Commissioner's motion for summary judgment [Doc. 13] be **GRANTED**; and (3) the decision of the Commissioner be **AFFIRMED**.

## I.  ADMINISTRATIVE PROCEEDINGS

Plaintiff initially filed his application for SSI and DIB on February 24, 2008, alleging disability as of December 18, 2005 (Transcript ("Tr.") 116-21).  Plaintiff's claim was denied initially and upon reconsideration and he requested a hearing before the ALJ (Tr. 68-85).  The ALJ held a hearing on September 23, 2009, during which Plaintiff was represented by an attorney (Tr. 29-58).  The ALJ issued a decision on November 3, 2009 and determined Plaintiff was not disabled because there were jobs he could perform in the national economy (Tr. 10-23). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final, appealable decision of the Commissioner (Tr. 1-2, 8).  Plaintiff subsequently filed Civil Action No. 2:11-cv-105 in this Court on April 8, 2011; however, the parties filed a joint motion to remand the case to the Commissioner pursuant to Sentence Four of 42 U.S.C. § 405(g), which was granted on September 29, 2011 [Civil Case No. 2:11-cv-105, Docs. 1, 14 & 15].  During the pendency of that claim, Plaintiff also filed a new application for DIB and SSI on February 28, 2011, which was denied initially and upon reconsideration, and Plaintiff requested a hearing before the ALJ (Tr. 465-66, 483-92, 519-20).  The Appeals Council indicated in its order remanding Plaintiff's initial claim to the ALJ that the ALJ should consider whether the two claims should be consolidated and whether an additional hearing should be held (Tr. 478-80). The Appeals Council order directed the ALJ to evaluate the non-treating and non-examining source opinion evidence more fully, give further consideration to Plaintiff's RFC, and solicit VE testimony to assess the impact of Plaintiff's non-exertional limitations on his ability to do work by asking a hypothetical question that encompassed all of Plaintiff's impairments (Tr. 478-80). Following a second hearing on July 6, 2012, the ALJ issued his second decision on August 10, 2012 and indicated that the two claims were consolidated; the ALJ further determined Plaintiff

was not disabled because there were jobs he could perform in the national economy (Tr. 396-415, 424-36).  There was no Appeals Council action, as Plaintiff did not file written exceptions with the Appeals Council and the ALJ's decision became the final decision of the Commissioner (Tr. 396-97).  Plaintiff filed the instant action on October 23, 2012 [Doc. 1].

## II.    FACTUAL BACKGROUND

### A.    2009 Hearing

Plaintiff was 46 at the first hearing, had graduated from high school, and had received a mechanic certification from trade school (Tr. 32-33, 192).  Plaintiff testified to having mental health issues his entire life, which had always affected his ability to stay in a job; he testified the longest he could recall holding a job down was for 18 months, but he generally would only stay in jobs for three to six months due to his issues with people (Tr. 33).  Plaintiff's last employment was with Goodwill Industries through a vocational rehabilitation program and was part-time; Plaintiff testified to having problems dealing with supervisors and coworkers in that job (Tr. 34). Plaintiff had been in therapy since 2005 and attended sessions twice monthly (Tr. 34).  Plaintiff testified therapy helped keep him level, and when he did not attend his sessions, he noticed increased anxiety (Tr. 35).  Plaintiff was not taking medication because he was hyper-sensitive to the side effects, but he had previously been on medication within the last year (Tr. 35). Plaintiff testified his therapist and psychiatrist both knew he was not taking medication and his psychiatrist noted he was very sensitive to side effects (Tr. 35-36).  Plaintiff described the side effects from his most recent medication as sexual dysfunction, stomach problems such as heartburn, and nightmares (Tr. 36).  Plaintiff testified he experienced intermittent episodes of depression that were very debilitating, lasted about three to six months, and were generally constant; there were maybe one or two periods of several weeks each in a year when Plaintiff

would not be depressed (Tr. 36-37). Plaintiff was more productive and creative when he was not depressed; otherwise, he isolated from others, avoided stress, and disassociated (Tr. 37).

Plaintiff had had problems with migraines for most of his life (Tr. 36). Plaintiff also described problems with his vision, as he was born with amblyopia, and severe hearing loss (Tr. 38). Plaintiff had been bitten by "kissing bugs" in the last two years, and he was highly allergic to them and had to be hospitalized after being bitten; after testing, it was possible he was positive for Chagas disease, but the blood samples may have been contaminated so it was inconclusive (Tr. 40-42). Plaintiff lived with his wife and two daughters and testified to very little social activity outside of his immediate family (Tr. 38-39). Plaintiff's wife received disability due to bipolar disorder (Tr. 39). Plaintiff's duties around the house included driving the children to school, doing household repairs, and some yard work (Tr. 39-40).

The ALJ sought testimony from medical expert Dr. Thomas Shot during the hearing. Dr. Shot opined Plaintiff did not have vocationally relevant intellectual limitations and then summarized Plaintiff's medical records, noting that his potential diagnosis of Chagas disease would be relevant due to the nervous system manifestations it caused (Tr. 42-46). Dr. Shot noted there was relevant evidence as to the severity of Plaintiff's depression and his credibility (Tr. 45-48). Dr. Shot testified that Plaintiff had an average IQ and good academic skills, and there was a paradox with his approach to treatment because he had a significant history of drug abuse, but claimed to be afraid of psychiatric medications; as a result of this representation, Plaintiff sought treatment with psychotherapy and self-administered herbal therapy, and Plaintiff's mental status in therapy was mostly normal (Tr. 50). Dr. Shot observed conflicting opinions as to Plaintiff's functional abilities, as some opinions noted extreme limitations and others noted Plaintiff's depression was mild; Dr. Shot opined the extreme limitations did not

seem to be consistent with the therapist's treatment notes (Tr. 50-51).

The ALJ also sought testimony from VE Donna Bardsley. The ALJ asked the VE to assume an individual with Plaintiff's age, education level, and work experience who could perform medium work, should avoid hazards, should not drive on the job, had less than perfect vision, was limited to simple, routine, repetitive tasks, and would work better with things rather than people (Tr. 55). The VE testified this individual could work as a hand packager, sorter, assembler, cleaner, or general laborer, with about 90,000 jobs in those categories regionally and seven million nationally (Tr. 55-56). The ALJ asked a second hypothetical which contemplated the same individual and same restrictions who could perform light work instead of medium; the VE testified this individual could perform the same jobs identified before, along with food service work, with 12,000 jobs regionally and 10 million nationally (Tr. 56). For the third hypothetical, the ALJ asked the VE to contemplate the same individual who was restricted to sedentary work, and the VE testified this individual could work as a hand packager, sorter, or assembler, with 1,000 jobs in the region and 900,000 nationally (Tr. 56). Finally, the ALJ asked the VE to assume the same individual, but to credit Plaintiff's testimony during the hearing; the VE testified that such an individual could not perform any jobs (Tr. 56-57). The VE further testified that if Plaintiff had severe difficulty accepting criticism from supervisors, he would not be able to maintain employment (Tr. 57).

**B. 2012 Hearing**

At his July 2012 hearing, Plaintiff reported his depression was more intense and there were fewer periods when he was doing well; he continued to see his therapist about every two weeks and the psychiatrist every three or four months (Tr. 427). Plaintiff thought therapy was helping him cope, and the herbal medication also helped (Tr. 427). Plaintiff testified he

continued to have migraines once or twice a month and each lasted one to three days; they involved sensitivity to light and nausea (Tr. 427-28). Plaintiff treated the migraines by lying down in a dark room and taking aspirin (Tr. 428). Plaintiff stayed at home most of the time and did not engage in regular social activities, but he drove his children places and went to the store occasionally (Tr. 428-29). Plaintiff slept poorly when he felt anxious, but overslept when he was depressed; he also experienced tension in his lower back when he was depressed (Tr. 429). Plaintiff tried to do yard work outside about once or twice a year (Tr. 429). Plaintiff testified his spouse's mental illness also increased his own mental problems (Tr. 430). Plaintiff spent his days staying at home, taking care of his wife, taking his children places, and going to the grocery store; when he was depressed, he stayed in bed most of the day (Tr. 430). Both he and his wife took care of the younger child's needs, with his wife doing more inside the home and Plaintiff taking the child to school and other activities (Tr. 430).

The ALJ sought the testimony of VE Dr. Robert Spangler during the hearing. The ALJ asked the VE to assume an individual with Plaintiff's age, educational level, and past work experience who could perform medium work with only frequent postural movements, no ropes, ladders or scaffolds, who should avoid concentrated exposure to extreme heat, extreme cold, vibrations, and hazards, could not drive on the job, was limited to simple, routine, repetitive work and was better with things than people (Tr. 432). The VE testified that this individual could work as a dishwasher, janitor, houseman, or in grounds maintenance and that the number of jobs (1,408,895 nationally and 33,474 regionally) would be reduced by 40 percent to account for the additional limitations (Tr. 432). The ALJ next asked the VE to assume the same individual who was restricted to light work instead, with all the same restrictions; the VE testified this individual could perform the same jobs at the lighter exertional level, with

1,985,000 jobs nationally and 42,030 regionally, reduced by 40 percent (Tr. 432-33). The ALJ asked a third hypothetical contemplating an individual restricted to sedentary work with the same restrictions identified in the first hypothetical, and the VE testified this individual could work as an electronic assembler, grinding machine operator, packaging machine operator, or inspector sorter with 162,000 jobs nationally and over 3,000 in the region reduced by 20 percent (Tr. 433). The ALJ finally asked the VE to assume the same individual, but to credit Plaintiff's testimony during the hearing; the VE testified no jobs would be available for such an individual (Tr. 433). Plaintiff's attorney pointed out that the assessment by Dr. Hamilton-Lockwood did not take into account Plaintiff's mental health treatment records, and that the assessment by Ms. Garland would preclude employment given her opinion of Plaintiff's marked impairments (Tr. 434-35).

### C. Medical Records

Plaintiff's most recent function report is dated November 19, 2008 (Tr. 202-09). Plaintiff indicated that when he was depressed he took his children to school, picked them up, watched TV, gathered wood in the winter, and tried to start projects; when he was not depressed he stayed busy all day (Tr. 202). Plaintiff took care of his wife and children and chauffeured them around; took care of pets, although he had help when he was depressed; sometimes had to be reminded to take care of personal needs like bathing or combing his hair; cooked occasionally; and performed household repairs and mowed twice a year (Tr. 203-04). Plaintiff indicated he had problems with motivation for household chores and repairs and needed someone to lay out his day (Tr. 204). Plaintiff went outside twice a day when he was depressed; he could drive; he went shopping, sometimes for extended periods of time; he preferred to be with other people but could do things on his own; and he could manage money (Tr. 205). Plaintiff enjoyed playing

board games with his family and talking to other family on the phone, but he was sometimes not very motivated and had a hard time focusing on tasks (Tr. 206-07). Plaintiff stated he tended to speak his mind, which had caused problems with jobs, and he did not handle stress well long-term (Tr. 208).

###     1.     Physical

Plaintiff attended a physical examination with Dr. Marianne Filka on June 12, 2008 (Tr. 277-80). Plaintiff reported back problems since 1998 or 1999 and described his back pain as being in his whole spine, in his neck and lower back; the pain came and went, although it was more constant in his neck and upper back (Tr. 277). His back pain worsened during bouts of depression and after prolonged sitting, standing, rest, and activity (Tr. 277). Plaintiff reported amblyopia in the right eye and migraines, but did not take any medication for the migraines; he relied on mostly herbal medications (Tr. 277-78). Dr. Filka observed Plaintiff's right eye showed evidence of amblyopia and his gait and range of motion were normal (Tr. 279). Dr. Filka diagnosed Plaintiff with depression, migraine headaches, chronic back pain, right esotropia secondary to amblyopia, right ear partial hearing loss, history of prostate problems, multiple allergies, and anxiety and panic attacks (Tr. 279).

Plaintiff was admitted to Baptist Hospital on July 21, 2008 after a reaction to insect bites that caused swelling and streaking up his arm; he was concerned he had been bitten by a Triatominae bug which had caused similar problems in the past (Tr. 319-20). On July 22, 2008, Dr. Joe Allison reviewed Plaintiff's file and opined his impairments were not severe (Tr. 281-84). Dr. Allison noted most of Plaintiff's complaints were mental and there was no evidence of a medically determinable impairment that was not related to his mental problems (Tr. 284).

Furthermore, Plaintiff's eye condition was corrected (Tr. 284). Dr. Allison's assessment was affirmed by Dr. James Moore (Tr. 344).

Plaintiff reported to Baptist Hospital complaining of low back pain after pulling on an object on August 10, 2008; he was treated with Ibuprofen and prescribed Lortab and Flexeril (Tr. 309-17). On August 13, 2008, Plaintiff established as a new patient with Dr. Stephen Manock for follow-up after his emergency room visits; an x-ray of his spine showed disc narrowing, but Plaintiff reported doing well on the medication until he loaded a truck that day (Tr. 338-39, 555-56). Plaintiff had recovered from his bug bites and was using bug nets to avoid contact with Triatominae bugs (Tr. 338). Plaintiff returned on August 29, 2008 complaining of stiffness in his lower back after working on cars and lying on a creeper; he had felt a pop in his back after bending and had run out of medication (Tr. 336-37, 553-54). Plaintiff was prescribed more muscle relaxers and hydrocodone-acetaminophen (Tr. 337). On September 17, 2008, Plaintiff complained of a persistent headache for the last three days that was helped with sleep, aspirin, caffeine and a dark room; he also complained of depression that was worse with weather extremes and caused problems with motivation (Tr. 334-35, 551-52). Plaintiff was taking St. John's Wort and was reluctant to take other medication, but he was prescribed a low dose of Elavil (Tr. 335). Plaintiff reported the Elavil made him too groggy during his visit on October 17, 2008 and had stopped taking it; his headaches were better, but his cholesterol was high and he was advised to continue following a diet (Tr. 332-33, 549-50).

Plaintiff returned to Dr. Manock on April 24, 2009 and stated his depression medication was not working due to severe side effects, and he was feeling down because of the winter, but did not want to try any new medication; he was having vision problems and wanted cancer screening (Tr. 546-48). On January 28, 2010, Plaintiff reported continued depression and

diagnoses of bipolar disorder, schizosocial disorder and major depression and he was in psychotherapy; he was very reluctant to try any other medication if therapy continued to help (Tr. 544-45). Plaintiff also reported migraines from twice a week to monthly and wanted medication to prevent them (Tr. 544). At his appointment with Dr. Manock on April 1, 2010, Plaintiff complained of increased depression over the last couple months and had been prescribed Buspar, but did not take it and was feeling better now; his migraines had also increased but were better now, occurring once a week; he had stopped taking medication because of increased anxiety, but aspirin and caffeine were working well (Tr. 542-43).

On May 5, 2011, Plaintiff submitted to a physical examination by Dr. David McConnell (Tr. 696-98). Plaintiff reported diagnoses of schizoid personality disorder and major depression, but did not take medication due to side effects; he also reported chronic migraines about once a week (Tr. 696). On examination, Dr. McConnell observed normal results and opined Plaintiff could lift and carry up to 40 pounds for 1/3 of a workday and 35 pounds for 1/3 to 2/3 of the workday, could stand and walk with normal breaks for a total of eight hours in a workday, and could sit with normal breaks for a total of eight hours in a workday (Tr. 697). On May 10, 2011, Dr. Saul Juliao opined there was no significant physical change from the ALJ's prior decision (Tr. 699-703). Dr. Juliao also filled out a physical residual functional capacity assessment, in which he opined Plaintiff could occasionally lift and/or carry up to 50 pounds, frequently lift and/or carry up to 25 pounds, stand and/or walk for up to 6 hours in an eight hour workday, sit for about six hours in an eight hour workday, and was unlimited in his ability to push and/or pull (Tr. 705). Plaintiff should only occasionally climb ladders, ropes, and scaffolds and should avoid concentrated exposure to extreme temperatures, vibration and hazards (Tr. 706-08). Dr. Juliao's opinion was affirmed by Dr. Carolyn Parrish on September 1, 2011 (Tr. 752).

Plaintiff returned to Dr. Manock on May 20, 2011 and complained of depression, but did not want medication; his headaches were improved (Tr. 720-21). On January 27, 2012, Plaintiff had a physical examination by Dr. Christopher Brooks, who also filled out an assessment of Plaintiff's ability to do work activities (Tr. 753-61). Plaintiff reported chronic migraines since age 10, treated with aspirin; mid low back pain beginning in 1998 that worsened when he was depressed and was not treated with medication; and a vision problem (Tr. 753). Dr. Brooks observed normal results on examination and diagnosed Plaintiff with history of chronic headaches, back pain, and history of amblyopia (Tr. 754-55). Dr. Brooks opined Plaintiff could frequently lift and/or carry up to 50 pounds and could occasionally lift and/or carry up to 100 pounds, restricted due to back pain; could sit for two hours at one time and four hours total in an eight hour day; could stand for one hour at a time and two hours total in an eight hour day; and could walk for one hour at a time and two hours total in an eight hour day (Tr. 756-57). Plaintiff had no restrictions in the use of his hands and feet, but should only frequently perform postural movements and was restricted visionally with poor depth perception (Tr. 757-58, 760). Plaintiff should never be at unprotected heights due to his vision problems, should only occasionally be exposed to extreme temperatures and vibrations, and should only frequently be exposed to other environmental limitations (Tr. 759-60). Plaintiff could shop, travel without a companion, walk without assistive devices, walk on rough surfaces, use public transportation, climb a few steps, prepare a simple meal, take care of personal hygiene, sort, handle, and use paper (Tr. 759).

### 2. Mental

Plaintiff had an intake session with Christy Claiborne at Cherokee Health on October 26, 2005 and complained of increased family problems, symptoms of depression such as decreased energy and motivation, anhedonia, problems sleeping and concentrating, and irritability (Tr. 557-

63). Plaintiff reported past drug use, social isolation, problems staying in jobs and an inability to keep a job, and past problems with agoraphobia (Tr. 557). Plaintiff was diagnosed with major depressive disorder, recurrent, moderate; bipolar disorder, not otherwise specified; and personality disorder, not otherwise specified, and his Global Assessment of Functioning ("GAF") was 45[1] (Tr. 557, 563). In November 2005, Plaintiff reported continued problems with his family and poor motivation; he was resistant to suggestions to improve his financial situation and start on projects (Tr. 564-65). Plaintiff was still having problems with his wife in December 2005 and was contemplating separating from her, but she agreed to start therapy (Tr. 566-68). On January 13, 2006, Plaintiff was less depressed than his previous session and was getting help with looking into disability, getting new glasses, and paying bills; he was resistant to finding a job through vocational rehabilitation (Tr. 569). At his next session on January 23, Plaintiff was having a good day but reported recent terrible depression over the last week; he was still having problems with his wife, although they were communicating better (Tr. 570).

Plaintiff submitted to a psychological evaluation with Dr. Abraham Brietstein on January 25, 2006 (Tr. 242-45). Plaintiff reported depression, avoiding social situations and not wanting to leave the house, panic attacks, and had just started treatment with Cherokee Health Center; he further reported numbness in his hands and problems with vision secondary to amblyopia (Tr. 242). Plaintiff reported self-employment, doing odd jobs with mechanics and carpentry and had not worked for anyone else since 1998, after another employee at a car dealership assaulted him (Tr. 243). Dr. Brietstein administered the Wechsler Adult Intelligence Scale-III (WAIS-III), Woodcock Johnson-III, and Personality Assessment Inventory, and Plaintiff scored a verbal IQ

---

[1] A GAF score between 41 and 50 corresponds to a "serious" psychological impairment; a score between 51 and 60 corresponds to a "moderate" impairment; and a score between 61 and 70 corresponds to a "mild" impairment. *Nowlen v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 718, 726 (E.D. Mich. 2003).

of 105, performance IQ of 98, and full scale IQ of 102, placing him in the average range of intelligence (Tr. 243). Plaintiff scored at or above the twelfth grade level on other tests, except for math (Tr. 243-44). Dr. Brietstein diagnosed Plaintiff with panic disorder with agoraphobia, major depressive disorder, recurrent, moderate, and rule out schizoid personality disorder; he recommended Plaintiff continue mental health treatment, perhaps try medication for depression, and that Plaintiff's goal of starting a home business appeared reasonable (Tr. 244-45).

Plaintiff had ups and downs with depression in February 2006 due to family stressors; at the end of the month, Plaintiff had researched his diagnoses and felt the research helped him understand himself and feel more motivated (Tr. 571-74). In March and April 2006, Plaintiff continued to have ups and downs affected by his wife's moods, but was doing better with hygiene and completing tasks at times; at other times, Plaintiff was resistant to suggestions and encouragement about how to stay on task and stay motivated (Tr. 575-82). By the end of Ms. Claiborne's treatment with Plaintiff when she left Cherokee Health, she indicated Plaintiff was able to increase his motivation on occasion but continued to experience symptoms of depression; his GAF was 55 (Tr. 582).

On May 31, 2006, Plaintiff began therapy sessions with Carol Brown, LCSW at Cherokee Health. Plaintiff stated that therapy had been helpful and his energy level was improving somewhat; he was in vocational rehabilitation and was hoping to start a small business (Tr. 583). In June, Plaintiff was working on his house and reported decreased depression, although there was still some marital tension; he was more depressed later in the month and had stopped working on the house due to decreased energy and a need for rest (Tr. 583-84). In July 2006, Plaintiff continued to experience depression affected by his wife's moods and financial stressors (Tr. 584-85). Plaintiff had a low grade depressed mood in August 2006

and believed he was about to enter his manic phase, which triggered his wife's mood swings; later in the month, Plaintiff had decreased energy and his wife had recently been in a manic episode which affected him (Tr. 585-86). Plaintiff reported his wife was more stable in mid-September 2006, but he was not feeling well physically and continued to be depressed with low motivation; his wife was having more problems later in the month, but Plaintiff had been helping his neighbor (Tr. 586-87). In October, Plaintiff reported continued periods of depression and periods of motivation and manic energy; during his depressed periods, Plaintiff was frustrated because of his wife's behavior and dealing with the public and became withdrawn and stopped engaging in self-care (Tr. 588-89). On October 26, 2006, Ms. Brown filled out a Clinically Related Group ("CRG") form and indicated Plaintiff was in the group of persons with severe mental illness, had moderate difficulties in activities of daily living, interpersonal functioning, concentration, task performance and pace, and adaptation to change; his GAF was 55 (Tr. 590-93).

In November 2006, Plaintiff reported increased anxiety symptoms due to his wife's mood swings; later in the month, he was experiencing fewer symptoms of depression and was able to do some work and react better in social settings (Tr. 594). Plaintiff was having financial stressors in December, but they improved by the holidays (Tr. 595). After Christmas, Plaintiff continued to experience depression based on financial issues, but was hopeful that starting vocational rehabilitation would be positive (Tr. 596). In January 2007, Plaintiff's spouse was away and he was in charge of the household and children; he would start vocational rehabilitation later that month (Tr. 596). Plaintiff was planning to use vocational rehabilitation to start a small business but had some problems with motivation as to larger tasks (Tr. 597-98). Plaintiff experienced some anxiety with his vocational rehabilitation and not hearing back from

representatives, but his motivation had increased in February and March; he cancelled his last two therapy sessions in March (Tr. 598, 601). In the beginning of April, Plaintiff reported increased depression and decreased energy and motivation and agreed to a psychiatry appointment (Tr. 601).

At the psychiatry session on April 24, 2007, Plaintiff complained of depression over the last ten years that had worsened over the last two months due to physical illness; his wife's mental illness also contributed to his depression (Tr. 532, 599). Plaintiff described difficulties staying motivated and was unsure about taking medication (Tr. 532, 599). Plaintiff was diagnosed with dysthymic disorder; rule out major depressive disorder; and personality disorder, not otherwise specified; and his GAF was 57 (Tr. 533, 600). At his next therapy appointment, Plaintiff was cheerful but reported recent depression; he was hoping to move on with his business (Tr. 602). On May 1, 2007, Plaintiff's GAF was estimated at 57 and during the month of May, Plaintiff was depressed and frustrated with vocational rehabilitation, but he and his wife were getting along better (Tr. 603-04). Plaintiff experienced ups and downs with depression in June 2007, was still reluctant to try medication, and was having conflict with his wife (Tr. 604-05). In July 2007, Plaintiff started working at Goodwill through vocational rehabilitation; in August, he reported increased anxiety with keeping up with work and marital tensions (Tr. 605-06). Plaintiff was still experiencing work and marital stress in September 2007 and was also having some physical problems that caused symptoms of depression; he started taking St. John's Wort for depression and thought it was helping (Tr. 606-07). Plaintiff finished his vocational rehabilitation program in October and reported some anxiety, but was dealing better with family stressors (Tr. 608).

A CRG form filled out by Ms. Brown and dated November 1, 2007 indicated that Plaintiff was in the group of persons who were formerly severely impaired, and Plaintiff had mild limitations in activities of daily living and interpersonal functioning, no limitations in concentration, task performance and pace, and moderate limitations in his adaptation to change (Tr. 610-11). His current GAF was 58 (Tr. 612). On November 12, 2007, Goodwill Industries filled out a Work Adjustment Final Report on Plaintiff (Tr. 265-66). Plaintiff had started a Work Adjustment Program beginning in July 2007 and his goals were to maintain a good attendance record, develop a good productivity rate within the first 30 days, and develop appropriate working relationship with peers and staff; it was noted he was often disheveled but his attire was generally appropriate (Tr. 265-66). During the course of the program, Plaintiff's attendance was perfect, his productivity level was 73%, his work quality was good, and Plaintiff interacted well with peers and staff when he was asked what to do, rather than told (Tr. 266). The report concluded that Plaintiff had proved to be capable of appropriate interpersonal skills (Tr. 266).

Plaintiff continued individual therapy in November 2007 and reported continued symptoms of depression and problems with his wife, but he was able to complete some tasks (Tr. 614). Plaintiff reported financial stressors in December, which were somewhat alleviated later in the month; Plaintiff was more motivated and felt more stable by the end of December (Tr. 614-15). In January 2008, Plaintiff reported some ups and downs, but things were better with his wife and he was mostly depressed because of their financial situation, which could be helped if she was awarded disability (Tr. 616). Plaintiff was setting goals in February 2008 although he still had symptoms of depression; he was considering applying for disability because vocational rehabilitation had been unable to find him a job, and he had been able to resolve some conflict with his neighbor (Tr. 617-18). Plaintiff reported a depressed mood and decreased energy in

March 2008 and wanted to suspend vocational rehabilitation and apply for disability; he was doing better later in the month, although he experienced problems staying interested in tasks (Tr. 618-20). In early April 2008, Plaintiff was having conflict with his spouse and was experiencing decreased focus and motivation (Tr. 621). At his psychiatry appointment on April 15, Plaintiff was diagnosed with likely dysthymic disorder, schizoid personality, and his GAF was 50; Dr. Suhkender Karwan was not sure he should be on any medication and noted he was not sure about Plaintiff's prognosis (Tr. 622). Plaintiff continued to report depression and family stressors in April and May 2008 (Tr. 623-26). During his appointment with Dr. Karwan on May 15, it was noted Plaintiff also likely had a mood disorder and possibly chronic dysthymic disorder (Tr. 627). In May and June 2008, Plaintiff reported various family issues that triggered depression and migraine headaches and had problems being in a crowd (Tr. 628-30).

Plaintiff submitted to a psychological evaluation with Donna Abbott, M.A., on June 10, 2008 (Tr. 268-75). Plaintiff reported diagnoses of major depression, unspecified personality disorder, and post traumatic stress disorder ("PTSD") and stated he had panic attacks occasionally (Tr. 268-69). Plaintiff also reported experiencing migraines about once a month that increased with stress, a depth perception problem that affected his vision, and hearing loss in his right ear; he was taking primarily herbal medications because he was hypersensitive to medication (Tr. 269). Plaintiff stated he subconsciously sabotaged his jobs by not getting along with people and getting fired or quitting (Tr. 270). Plaintiff reported previous hallucinations from LSD, but his current thought processes were normal and he appeared rational and alert (Tr. 271). Plaintiff reported his depression started in 1998 and was characterized by staying in bed a lot for long periods of time and being unable to finish projects, hopelessness, low energy, and difficulty with attention and concentration (Tr. 271-72). Ms. Abbott observed Plaintiff appeared

moderately depressed (Tr. 272). Plaintiff stated he tried to make himself do chores and force himself to get out of the house when he wanted to stay home, he had a few friends, but did not do activities with them (Tr. 272-73). Ms. Abbott diagnosed Plaintiff with major depressive disorder, recurrent, moderate and personality disorder, not otherwise specified, with avoidant and schizoid features, and estimated Plaintiff's GAF at 54 (Tr. 273). She further opined Plaintiff could understand and remember; had average intellectual functioning; could attend and concentrate, but might have some problems maintaining a regular work week due to periods of depression; was significantly limited in social interaction, general adaptation, adaptation to change, working in proximity to others, and dealing with stress; but would be able to set goals and make plans to achieve those goals, and could drive and travel alone (Tr. 274). Ms. Abbott opined Plaintiff's prognosis was guarded for significant change in light of his personality disorder features (Tr. 274).

Plaintiff reported an improvement in mood and an ability to get work done on his house in June and July 2008 (Tr. 631-33). At his appointment with Dr. Karwan on July 10, he was diagnosed with schizoid personality, bipolar type II, mood disorder, not otherwise specified, and a likelihood of chronic dysthymia, but Dr. Karwan noted Plaintiff's bouts of depression were less episodic (Tr. 635). Plaintiff continued to report depression later in July 2008 and was having financial and family stressors, but he was able to get work done each day (Tr. 636-39).

On August 4, 2008, Dr. Salley Jessee filled out a mental residual functional capacity assessment ("MRFC") and a psychiatric review technique ("PRT") forms (Tr. 285-302). Dr. Jessee opined Plaintiff was moderately limited in activities of daily living, maintaining social functioning, and maintaining concentration, persistence and pace, but had had no episodes of decompensation (Tr. 299). Dr. Jessee noted Plaintiff was partially credible, as he seemed to

have inadequately treated moderate depression and had traits of narcissistic personality disorder; however, Dr. Jessee opined Plaintiff's report of severe symptoms was not credible due to his ability to function adequately and because he was running the household and taking care of the children (Tr. 301). Dr. Jessee noted it was unclear what role marijuana abuse played in Plaintiff's described lack of motivation (Tr. 301). Dr. Jessee opined Plaintiff was moderately limited in understanding, remembering and carrying out detailed instructions; working in coordination with or proximity to others without being distracted by them; interacting appropriately with the general public; and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; otherwise, Plaintiff was not significantly limited (Tr. 285-86). Dr. Jessee opined Plaintiff could understand, remember and carry out simple, repetitive and routine tasks and could make simple work decisions; he could maintain concentration and attention for two hour periods during the workday, he could complete a normal workweek, adapt to simple change, and avoid hazards, but would work best in an environment without frequent interpersonal contact (Tr. 287).

Plaintiff was somewhat depressed in August 2008 and was not feeling well due to being stung by another bug and having injured his back, but his spouse was being supportive (Tr. 640-42). Plaintiff was improved in September 2008 and was able to get work done around the house, he and his wife were getting along better, and he was better able to control his mood swings; he had agreed to try an antidepressant (Tr. 643-46). Plaintiff saw Dr. Karwan on October 2, 2008 and agreed to think about trying a medication for his depression, and stated his primary care physician had convinced him to try Adderall,[2] which had aftereffects he did not like (Tr. 647).

---

[2] Based on the records of Dr. Manock, referenced above, it appears this was actually a prescription for Elavil.

Carol Brown filled out a mental assessment of Plaintiff's ability to do work-related activities on October 2, 2008, in which she opined Plaintiff had poor abilities to make occupational adjustments, such as dealing with stress, interacting with supervisors, and maintaining attention and concentration; Plaintiff had a fair ability to follow work rules (Tr. 321). She noted Plaintiff had been diagnosed with a personality disorder and had problems interacting with others, especially authority figures (Tr. 322). Plaintiff's ability to understand, remember and carry out complex or detailed job instructions was poor, and he had a fair ability to understand, remember and carry out simple instructions, which was attributable to difficulties concentrating and being easily distracted and unable to complete tasks (Tr. 322). Plaintiff had a poor ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability (Tr. 322). Ms. Brown noted Plaintiff was often unkempt, experienced mood swings, was often depressed, and could not follow through on projects he started (Tr. 322). Ms. Brown opined Plaintiff's impairments would last for not less than 12 months (Tr. 323).

Plaintiff saw Ms. Brown for therapy on October 9, 2008 and reported improvement in mood, but some recent stress with his children being ill and having problems in school (Tr. 395). Plaintiff was depressed later in October and reported his grandmother fell and broke her hip and needed surgery; he and his father had had a breakthrough in their relationship and had started to communicate more (Tr. 394). Plaintiff was still concerned about his grandmother at the end of the month and was still depressed; his spouse had been manic lately which made him feel rejected (Tr. 392-93). Plaintiff continued to report depression, family stressors, and ups and downs in his mood in November 2008 (Tr. 390-91). During his appointment with psychiatrist Dr. Karwan on November 26, 2008, Plaintiff agreed to try Wellbutrin; Dr. Karwan noted

Plaintiff appeared somewhat depressed and had a history of dysthymic disorder (Tr. 389). In December 2008, Plaintiff reported improvement although his daughter was still having problems in school; his wife was on disability and they now had a dependable income (Tr. 386-88).

On December 9, 2008, Dr. Frank Kupstas filled out MRFC and PRT forms (Tr. 345-62). Dr. Kupstas opined Plaintiff had mild restrictions in activities of daily living, was moderately restricted in maintaining social functioning, concentration, persistence and pace, and had had no episodes of decompensation (Tr. 355). Dr. Kupstas opined Plaintiff presented with personality disorder and symptoms of depression and anxiety with occasional panic attacks, but he was on medication and reported occasional cannabis use, and he was able to take care of his personal needs, care for pets and children, prepare meals, chores, drive, and shop (Tr. 357). Dr. Kupstas found Plaintiff to be generally credible (Tr. 357). He more specifically opined Plaintiff was moderately limited in maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; working in coordination with or proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and responding appropriately to changes in the work setting (Tr. 359-60). Dr. Kupstas noted Plaintiff could maintain concentration, persistence and pace over extended periods for simple tasks and could perform the same with detailed tasks with some difficulty; he could interact with the general public with some difficulty, and he could respond to routine changes (Tr. 361).

Plaintiff was depressed in early January 2009 and was concerned about his mother's health; during his appointment with Dr. Karwan on January 23, 2009, he reported being able to tolerate the Wellbutrin and noted no symptoms for the past couple of weeks (Tr. 384-85). On January 29, 2009, Plaintiff was relieved about his mother starting chemotherapy (Tr. 383). Plaintiff had difficulties attempting to work in February 2009 and was unsuccessful at continuing the job after four days; he later reported irritability and stopped taking his medication due to side effects (Tr. 380-82). On March 12, 2009, Plaintiff reported periods of depression since he stopped taking the medication, but he could not tolerate the side effects; at his appointment with Dr. Karwan the next day, it was noted he seemed to be very sensitive to psychotropic medication and his depression was mostly seasonal and related to family issues (Tr. 378-79). His medication was discontinued and Plaintiff was encouraged to continue therapy (Tr. 378). Plaintiff was stable the following week, but reported some depression later in March (Tr. 376-77). Plaintiff continued to report various family stressors and breakthroughs throughout April 2009 and at times had problems with motivation and energy; at the end of the month, he was cheerful and stable and had recently completed a project, although he reported a recent period of depression and a few problems with distraction and motivation (Tr. 372-75).

In May 2009, Plaintiff was more depressed and reported more problems with motivation (Tr. 370-71). Plaintiff reported stress and anxiety in early June and was having problems with his spouse and other family stressors (Tr. 369). Plaintiff's mood had improved and he was taking steps towards continuing work on the house in late June, but was having a hard time getting started on tasks and finishing them (Tr. 368). In July 2009, Plaintiff reported family, health and financial stressors but had been able to work on the house and was getting along better with his spouse (Tr. 365-67). Plaintiff reported the death of his grandmother in August

2009, but felt he made progress in his relationship with his father (Tr. 680). Plaintiff saw Dr. Karwan on September 2, 2009 and he noted diagnoses of schizoid personality traits and dysthymic disorder; Dr. Karwan further noted Plaintiff's sensitivity to side effects of medication and Plaintiff would continue to be treated conservatively (Tr. 681). During Plaintiff's next psychiatry appointment on November 25, 2009, Plaintiff exhibited paranoia, subjective and objective depression with significant anhedonia, trouble with concentration, and chronic despair; Dr. Karwan noted Plaintiff's sensitivity to psychotropic medication and need for continued conservative treatment (Tr. 536). Plaintiff's GAF was estimated at 57 on December 1, 2009 (Tr. 685).

Carol Brown filled out another assessment of Plaintiff's ability to do work activities on March 18, 2010 (Tr. 539-41). Ms. Brown again opined Plaintiff had poor or no abilities to make occupational adjustments, such as dealing with the public, interacting with supervisors, and maintaining attention and concentration; Plaintiff had a fair ability to follow work rules and function independently (Tr. 539). She noted Plaintiff had been diagnosed with a personality disorder and had difficulties relating to coworkers and supervisors, he experienced anxiety and was easily frustrated when under stress, and he had difficulty completing tasks (Tr. 539). Plaintiff's ability to understand, remember and carry out complex or detailed job instructions was poor, and he had a fair ability to understand, remember and carry out simple instructions, which was attributable to difficulties maintaining concentration and interest due to depression and anxiety (Tr. 540). Plaintiff had a poor ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability (Tr. 540). Ms. Brown noted Plaintiff had poor hygiene, was easily frustrated, and had conflicted relationships (Tr. 540).

On March 5, 2010, Dr. Karwan noted Plaintiff was distressed and complained of chronic depression, frustration, poor coping, difficulties focusing and concentration; he was only able to manage picking up firewood at home and became stressed by the middle of the day (Tr. 538). Plaintiff's headaches were improved (Tr. 538). Dr. Karwan noted diagnoses of schizoid personality and dysthymic disorder and further noted Plaintiff needed to continue psychotherapy, as he was adamant that he could not tolerate medications and he was too disorganized to stay focused on treatment modalities (Tr. 537-38). Plaintiff returned to Dr. Karwan on June 2, 2010 and reported he was depressed and had no motivation to do anything; the family was having financial stressors and he was experiencing anxiety and coping poorly with stress (Tr. 689). At his next appointment on August 25, 2010, Dr. Karwan noted Plaintiff's coping mechanism was quite idiosyncratic and he continued to desire conservative treatment (Tr. 691).

On March 4, 2011, Dr. Karwan noted Plaintiff's poor work history was attributable to significant agoraphobia, low-grade paranoia, disorganization, and an inability to function under an authority figure; he experienced chronic despair over prior negative life experiences (Tr. 692). Ms. Brown wrote a letter on March 29, 2011 indicating that she was continuing therapy with Plaintiff for depression, anxiety, PTSD and a personality disorder and that although Plaintiff had made progress resolving the PTSD, he had a long history of chronic depression that caused decreased motivation and difficulty functioning (Tr. 694-95). Plaintiff had problems completing projects, had poor hygiene, a history of problems in work settings due to issues relating to authority figures and coworkers (Tr. 694). Plaintiff also experienced chronic anxiety and increased symptoms which involved panic attacks (Tr. 694). Ms. Brown opined Plaintiff would have difficulty being a reliable employee and, based on her treatment of him since 2006, she

further opined that he would not be able to maintain employment (Tr. 695). Plaintiff's GAF score may have been 57 in April 2011 based on a CRG assessment (Tr. 749).

Plaintiff submitted to a psychological evaluation with Alice Garland, M.S., on May 17, 2011 and she completed a report and filled out an assessment of Plaintiff's ability to do work related activities (Tr. 713-19). Plaintiff reported he could not work due to a personality disorder because he did poorly with authority figures over time and depression kept him down; he also reported bipolar disorder, PTSD, migraines, and back pain he thought was due to depression (Tr. 713-14). Plaintiff reported having problems staying in jobs for long periods of time due to emotional problems (Tr. 714). Ms. Garland observed a disturbed thought process, a manicky mood, fair to poor insight and judgment, and estimated average intelligence (Tr. 715). Plaintiff reported feeling worthless and helpless and having difficulty getting motivated, but he was involved in child care activities, car repair, and grocery shopping because his wife was more agoraphobic (Tr. 715). Plaintiff often had conflict with others, which was one reason he stayed home, and Ms. Garland opined his ability to relate overall was poor to impaired (Tr. 715-16). Ms. Garland's impressions were depressive disorder, not otherwise specified; generalized anxiety disorder, not otherwise specified; and schizoid personality disorder (Tr. 716). Her report was countersigned by Dr. C. Randall May (Tr. 716). Ms. Garland opined Plaintiff was mildly limited in his ability to understand and remember complex instructions; moderately to markedly impaired in his ability to carry out complex instructions; markedly impaired in his ability to make judgments on simple work-related decisions, and extremely impaired in his ability to make judgments on complex work-related decisions (Tr. 717). She further opined he was markedly limited in his ability to interact appropriately with the public, supervisors and coworkers and his

ability to respond appropriately to usual work situations and to changes in a routine work setting (Tr. 718).

On May 31, 2011, Dr. Frank Kupstas filled out MRFC and PRT forms after reviewing additional information in Plaintiff's file (Tr. 729-46). Dr. Kupstas opined Plaintiff had mild restrictions in activities of daily living, was moderately restricted in maintaining social functioning, concentration, persistence and pace, and had had no episodes of decompensation (Tr. 739). Dr. Kupstas opined Plaintiff presented with symptoms of depression and anxiety with schizoid personality traits and his alleged symptoms were credible, resulting in moderate limitations (Tr. 741). He more specifically opined Plaintiff was moderately limited in performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; working in coordination with or proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes (Tr. 743-44). Dr. Kupstas noted Plaintiff could maintain concentration, persistence and pace for two hour periods; he would have difficulty interacting with the general public on a sustained basis, and he could adapt to routine changes (Tr. 745). Dr. Kupstas also reviewed Plaintiff's file in conjunction with the ALJ's prior decision and opined there had been a significant change because Plaintiff now exhibited moderate, instead of mild, limitations in concentration, persistence and pace (Tr. 724-28).

Plaintiff returned to Dr. Karwan on June 24, 2011 and reported he was unusually depressed for summer; Dr. Karwan noted Plaintiff had chosen to take St. John's Wort for

depression and he had a good relationship with his therapist (Tr. 747). During his appointment on September 23, 2011, Dr. Karwan noted Plaintiff's significant anxiety and agoraphobia and that Plaintiff reported depression and isolation; Plaintiff also complained of poor eyesight but an inability to afford glasses, and was insecure financially (Tr. 785).

Plaintiff submitted to a psychological evaluation by Dr. Shana Hamilton-Lockwood on February 13, 2012 (Tr. 762-77). Plaintiff reported no mental health hospitalizations, but treatment over a series of years; he stated he refused to take certain medication, but was taking St. John's Wort when he felt depressed (Tr. 764). Plaintiff reported being depressed, anxious and irritable in the last month and had no motivation or energy; he tried to stay home and avoid people because they made him anxious (Tr. 764). Plaintiff had panic attacks about three to five times a year (Tr. 764). Plaintiff did not have good or bad days and reported all days were the same (Tr. 764). Dr. Hamilton-Lockwood administered the Wechsler Adult Intelligence Scale Fourth Edition (WAIS-IV) and estimated Plaintiff was in the average range of intellectual functioning; he received a full scale IQ score of 94 (Tr. 764-68).[3] In the WRAT4 tests, Plaintiff scored at the eighth grade level in math computation and the eleventh or twelfth grade level in word reading, sentence comprehension, and spelling (Tr. 768-70). The results of an interview to determine feigning or malingering in Plaintiff's reported symptoms were indeterminable (Tr. 771). Plaintiff had significantly elevated scores on the M-FAST test, also designed to determine whether an individual was malingering, which suggested Plaintiff was endorsing symptom combinations that were inconsistent with mood or psychiatric disorders (Tr. 771). Plaintiff reported an ability to manage finances, prepare simple meals, grocery shop, and drive his

_____

[3] Although Dr. Hamilton-Lockwood stated Plaintiff's general cognitive ability was within the average range of intellectual functioning, based on his full scale IQ score, she later stated this same score placed Plaintiff in the extremely low range of intellectual functioning, which seems incorrect when compared to Dr. Brietstein's assessment of similar IQ scores (Tr. 765, 773).

children around; his wife took care of cleaning the house (Tr. 773). Plaintiff had no hobbies and spent his days watching TV, talking to his wife, and chopping firewood (Tr. 773). Dr. Hamilton-Lockwood observed a depressed mood, some evidence of malingering in reporting his symptoms, but Plaintiff had set forth a reasonable amount of effort during testing (Tr. 772). Dr. Hamilton-Lockwood diagnosed Plaintiff with generalized anxiety disorder, dysthymic disorder, malingering, personality disorder, not otherwise specified with narcissistic traits, and estimated his GAF at 65-70 (Tr. 774). Dr. Hamilton-Lockwood opined Plaintiff was mildly impaired in social relating and ability to adapt to change, but was able to follow instructions and showed no impairment in sustaining concentration (Tr. 774). Dr. Hamilton-Lockwood filled out an assessment of Plaintiff's ability to do work activities and more specifically opined Plaintiff had no limitations in his ability to understand, remember or carry out instructions and mild limitations in his ability to interact appropriately with supervisors, coworkers and the public (Tr. 775-77).

Plaintiff returned to Dr. Karwan on February 24, 2012 and was frustrated and disheartened with his financial situation and medical issues; Dr. Karwan noted low grade paranoia, agoraphobia and disorganization (Tr. 787). Plaintiff reported continued financial stress on May 29, 2012 and was depressed at his inability to see well (Tr. 789).

## III.    ELIGIBILITY AND THE ALJ'S FINDINGS

### A.    Eligibility

The Social Security Administration determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(I-v). The five-step process provides:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable

physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden to show the extent of his impairments, but at step five, the Commissioner bears the burden to show that, notwithstanding those impairments, there are jobs the claimant is capable of performing.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

A.      The ALJ's Findings

At step one of the process, the ALJ found Plaintiff had not engaged in any substantial gainful activity since December 18, 2005, the alleged onset date (Tr. 401). The ALJ noted some earnings in 2006 and 2007, but found this did not rise to the level of substantial gainful activity (Tr. 401-02). At step two, the ALJ found Plaintiff had the following "severe impairments": migraine headaches; back disorder; history of amblyopia; depression; personality disorder; bipolar disorder; anxiety; and panic disorder with agoraphobia (Tr. 402). At step three, the ALJ found Plaintiff did not have any impairment or combination of impairments to meet or medically equal any presumptively disabling impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 (Tr. 406). Specifically, the ALJ considered Listings 12.04, 12.06, 12.08, 12.09 and other listings under 12.00 (Tr. 406-08). The ALJ determined the Plaintiff had the RFC to perform medium work except he was limited to frequent postural activities but could never climb ropes, ladders or

scaffolds; should avoid concentrated exposure to extreme heat, extreme cold, vibration, or hazards; could not drive; was limited to simple, routine, repetitive job tasks; and would work better with things rather than people (Tr. 408). At step four, the ALJ found that Plaintiff was unable to perform any of his past relevant work (Tr. 413). At step five, the ALJ noted that Plaintiff was a younger individual, 18-49, had at least a high school education and was able to communicate in English and, after considering Plaintiff's age, education, work experience, and RFC, the ALJ found there were jobs that existed in significant numbers in the national economy which Plaintiff could perform (Tr. 414-15). This finding led to the ALJ's determination that Plaintiff has not been under a disability as of December 18, 2005 (Tr. 415).

## IV. ANALYSIS

Plaintiff asserts various arguments which are all intertwined and can essentially be addressed together. First, Plaintiff argues the ALJ did not adequately address the opinions of treating physicians and examining sources and did not properly consider the opinions regarding Plaintiff's mental health, as Plaintiff alleges his mental impairments preclude all work. Second, Plaintiff argues the hypothetical question posed to the VE did not encompass all of Plaintiff's impairments and the ALJ could not rely on VE testimony as evidence of jobs Plaintiff could perform. Underlying both arguments is Plaintiff's contention that the ALJ did not pay adequate attention to the instructions given by the Appeals Council upon remand of Plaintiff's claim to the ALJ, which involved the ALJ's consideration of opinion evidence, Plaintiff's RFC, and the VE testimony.

### A. Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner v. Comm'r of*

*Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may not, however, consider any evidence which was not before the ALJ for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, No. 1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing

*McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived).

### B.    Opinion Evidence, RFC Determination, and VE Testimony

Plaintiff's arguments begin with the assertion that the ALJ did not adhere to the Appeals Council's instructions on remand.  Generally, Plaintiff argues the ALJ seemed to approach the case as though he had to adopt the prior residual functional capacity findings if nothing significant had changed in the interim; however, that was inappropriate because the Appeals Council vacated the earlier decision [Doc. 12 at PageID# 56-57].  As such, Plaintiff asserts the ALJ was supposed to re-weigh all the evidence applicable to Plaintiff's claim and erred if he relied on *Drummond v. Comm'r of Soc. Sec.*, 136 F.3d 837 (6th Cir. 1997) instead [*id.* at PageID# 57].

Couched in this claim is Plaintiff's allegation with respect to the ALJ's consideration of various opinions as to Plaintiff's work abilities and Plaintiff's argument that he cannot work due to his mental impairments.  Specifically, Plaintiff finds error with the ALJ's consideration of Ms. Brown's opinion and his assessment of Plaintiff's treatment records from Cherokee Health [*id.*].  Plaintiff further finds fault with the ALJ's consideration of the opinion of Ms. Abbott and Dr. Stanley, which was required by the Appeals Council on remand; Plaintiff contends the ALJ gave the opinion weight only to the extent it supported his conclusions and dismissed other relevant parts of the opinion, such as the finding that Plaintiff would have difficulty maintaining a regular schedule and had difficulty with social interaction and adaptation [*id.* at PageID# 57-58].  Plaintiff argues the ALJ further erred in considering the opinion of Ms. Garland and Dr. May for similar reasons, as he gave little weight to the opinion, stating it was not consistent with the other evidence, particularly his finding as to Plaintiff's treatment records at Cherokee Health [*id.* at

PageID# 58].  Plaintiff contends this finding, and reliance on the finding to discount certain opinions, ignores Plaintiff's history of mental illness [*id.*].  Plaintiff asserts the only evidence to the contrary is Dr. Hamilton-Lockwood's assessment, but instead of adopting any full opinion from any treating or examining source, the ALJ selectively picked only portions of various opinions while he ignored other parts of the opinions to reach his conclusion [*id.* at PageID# 61-62].  Plaintiff argues the ALJ erred in substituting his opinion for those of the examining and treating sources [*id.* at PageID# 62].

From a physical standpoint, Plaintiff argues the ALJ failed to properly weigh Dr. Brooks' opinion, as he accepted parts of the opinion that supported his conclusions but rejected other parts [*id.*].  Plaintiff argues that Dr. Brooks' opinion would preclude a range of medium work because of his restrictions as to sitting and standing and, to the extent this was contradictory with the rest of his opinion, the ALJ could have sought clarification instead of substituting his judgment for that of the doctor [*id.* at PageID# 58-59].

Finally, Plaintiff contends the ALJ did not pose an appropriate hypothetical question to the VE, as directed on remand, because the VE did not identify the number of each job listed and instead gave a range of percentages by which the range of medium work would be decreased due to Plaintiff's non-exertional limitations [Doc. 12 at PageID# 56].  Plaintiff further contends the question posed to the VE did not adequately capture Plaintiff's mental limitations, given that the ALJ found Plaintiff had moderate limitations in maintaining concentration, persistence and pace and social functioning, but did not incorporate these limitations in his hypothetical question [*id.* at PageID# 60-61].  Plaintiff alleges the restriction to simple, routine, repetitive tasks was not sufficient to convey these moderate limitations [*id.* at PageID# 61].  Plaintiff further argues that due to the ALJ's improper assessment of Dr. Brooks' opinion as to Plaintiff's ability to stand and

walk, the hypothetical question was also flawed from a physical standpoint [*id.*]. As a result, the VE's testimony cannot serve as a basis for the ALJ's finding that Plaintiff can perform other work in the national economy [*id.*].

The Commissioner initially argues that none of the opinions upon which Plaintiff relies were provided by a treating physician, and many were not provided by medical doctors, which affects the weight the ALJ was required to afford to each opinion [Doc. 14 at PageID# 73]. The Commissioner asserts the opinion of an examining physician is not entitled to any special weight and opinions as to Plaintiff's abilities are not determinative, as the ALJ must ultimately decide Plaintiff's RFC [*id.*]. The Commissioner contends the ALJ gave several reasons for giving less weight to the opinions Plaintiff claims were entitled to more weight; specifically, the ALJ noted the opinions of Ms. Brown and Ms. Garland were not consistent with the evidence from Cherokee Health, which showed Plaintiff had consistent GAF scores and his symptoms were controlled with therapy; he completed the work rehabilitation program and worked at Goodwill Services; he had never required hospitalization for his mental problems; and the opinions were not consistent with Plaintiff's reported daily activities [*id.* at PageID# 75-76]. The Commissioner argues these reasons are supported by substantial evidence and the ALJ did not misread his treatment records from Cherokee Health because his GAF score improved after treatment, his psychiatrist noted his bouts of depression were less frequent, and Plaintiff did not exhibit active psychosis; in addition, Plaintiff's demeanor, mood and attitude were mostly normal [*id.* at PageID# 76]. The Commissioner additionally contends the ALJ's observation of the statements made in the Goodwill report following completion of the work rehabilitation program, along with Plaintiff's statements that he worked on his home, did yard work, took his children places, and went grocery shopping, provide support for his consideration of the opinions

which indicated more severe limitations [*id.* at PageID# 77]. As for the opinion of Ms. Abbott, the Commissioner argues the ALJ gave the opinion some weight, but found it was inconsistent with the results on examination, his GAF score which indicated only a moderate impairment, and his performance at Goodwill [*id.*].

As to the opinion of Dr. Brooks, the Commissioner claims the ALJ noted the inconsistency in Dr. Brooks' opinion and determined it was too restrictive as to Plaintiff's ability to stand and walk compared to Dr. Brooks' findings on examination and other parts of his opinion [*id.* at PageID# 78]. The Commissioner claims the ALJ's treatment of this opinion, along with the opinion of Dr. McConnell, was supported by substantial evidence [*id.* at PageID# 79].

The Commissioner finally argues the ALJ's hypothetical question included all limitations he found were supported by the evidence, and Plaintiff's argument concerns the ALJ's finding on his PRT analysis, which does not reflect the claimant's RFC [Doc. 14 at PageID# 79-80]. The Commissioner acknowledges the ALJ did not include limitations in concentration, persistence and pace in his RFC, but he incorporated Plaintiff's difficulties in this area by limiting Plaintiff to simple, routine, repetitive tasks and working with things rather than people; as such, the hypothetical question included Plaintiff's limitations and the ALJ could properly rely upon the VE's testimony in response to this hypothetical question [*id.* at PageID# 80].

Because Plaintiff's arguments are somewhat parallel in that he challenges the ALJ's decision on its own and additionally in the context of the remand instructions, I will address the issues in the order in which they appeared in the Appeals Council remand order, starting with the ALJ's consideration of the opinion evidence, then the RFC determination, and finally the VE testimony.

## 1. Opinion Evidence

In the order remanding the claim, the Appeals Council first noted the ALJ had not adequately evaluated the opinion evidence in the record, particularly the opinions of Ms. Abbott, Ms. Brown, Dr. Jessee, and Dr. Kupstas (Tr. 478-79).[4] The order directed the ALJ to further consider the opinion evidence and assess the weight afforded to each opinion (Tr. 479).

Due to the wealth of opinions in the record, a timeline of the certain opinions and other relevant information may be helpful. First, as to Plaintiff's physical complaints:

- June 2008    Dr. Filka examination    no restrictions noted (Tr. 277-80)
- **November 3, 2009 – ALJ's prior decision (Tr. 10-23)**
- May 2011    Dr. McConnell examination    medium work except restricting to lifting and/or carrying a maximum of 40 pounds (Tr. 696-98)
- May 2011    Dr. Juliao record review    medium work (Tr. 704-12)
- January 2012    Dr. Brooks examination    medium/heavy work as to lifting and carrying, but more restricted as to standing and walking (Tr. 753-61)

The ALJ stated in his decision that he was giving little weight to the opinions of state agency physicians who opined Plaintiff had no severe physical impairments, but was giving great weight to the examinations and evaluations of the state agency physicians (i.e., Dr. Juliao and the affirmation by Dr. Parrish) because their opinions were consistent with his RFC determination (Tr. 411). He noted Dr. Filka and Dr. Manock had not imposed any permanent restrictions on Plaintiff due to physical impairments and further noted that he had considered Dr. McConnell's opinion, but gave it little weight because it was not consistent with his own findings or the other

---

[4] The Appeals Council order also referenced a document by Dr. Joe Allison indicating Plaintiff's physical impairments were not severe (Tr. 281-84). At the time of the ALJ's prior decision, there was only one physical examination in the record; at the time of his new decision, there were three more record reviews and physical examinations to review. To the extent Plaintiff makes any argument the ALJ failed to comply with remand instructions in this area as well, the ALJ addressed each opinion as to Plaintiff's physical impairments as discussed *infra*.

evidence (Tr. 411). The ALJ noted that Dr. McConnell's restriction to 40 pounds was not consistent with results on examination (Tr. 411). Finally, as to Dr. Brooks' opinion, the ALJ gave the opinion great weight, but noted that Dr. Brooks' statements as to Plaintiff's ability to stand, walk and sit were too restrictive based on his findings on examination and the other evidence (Tr. 411).

After a close review of Dr. Brooks' opinion, it appears fairly clear this was an unintended inconsistency. On examination, Dr. Brooks stated that Plaintiff's gait and station were normal, he could perform tandem gait testing, could stand on each leg individually, could squat 100% of the way to the floor, and could walk on his heels and toes (Tr. 755). On the fill-in-the-blank form, however, Dr. Brooks had originally checked boxes to indicate that Plaintiff could sit for eight hours total in an eight hour day and stand and walk for four hours total respectively in an eight hour day, but changed the checkmarks to instead reflect that Plaintiff could sit for four hours total and stand or walk for two hours total respectively (Tr. 757). This restriction does seem to be starkly at odds with the bulk of Dr. Brooks' opinion, particularly given his opinion that Plaintiff could essentially perform heavy work as it pertained to lifting and/or carrying, and may be explained by an incorrect understanding that the total hours specified for all activities could not be over eight (as it was changed from totaling 16 to totaling eight). Although the ALJ could have inquired with Dr. Brooks about this inconsistency, it appears clear from all of the evidence that Plaintiff did not have physical impairments that would result in such restrictions on his ability to sit, stand and walk. All of the other evidence in the record pertaining to Plaintiff's physical impairments points to an ability to sit, stand and walk at least at medium work requirements, and there is essentially no evidence to the contrary besides the inconsistency in Dr. Brooks' opinion. Accordingly, I **FIND** the ALJ properly considered the opinion evidence

related to Plaintiff's physical impairments and properly complied with the remand order.

As to evidence about Plaintiff's mental health impairments, the timeline is as follows:

- January 2006   Brietstein evaluation   average intellectual functioning (Tr. 242-45)
- October 2006   GAF score of 55 (Tr. 535)
- April/May 2007   GAF score of 57 (Tr. 533, 600, 603-04)
- November 2007   GAF score of 58 (Tr. 612)
- April 2008   GAF score of 50 (Tr. 622)
- June 2008   Ms. Abbott/Dr. Stanley evaluation and opinion   GAF score of 54, but possible problems maintaining a workweek and significant limitations in social interaction, adaptation to change, working in proximity to others, and dealing with stress (Tr. 268-75)
- August 2008   Dr. Jessee record review   moderate limitations in some areas (Tr. 285-302)
- October 2008   Ms. Brown opinion   poor abilities and significant limitations in most areas (Tr. 321-23)
- December 2008   Dr. Kupstas record review   moderate limitations in some areas (Tr. 345-62)
- **November 3, 2009 – ALJ's prior decision (Tr. 10-23)**
- December 2009   GAF score of 57 (Tr. 685)
- March 2010   Ms. Brown opinion   poor abilities and significant limitations in most areas (Tr. 539-41)
- March 2011   Ms. Brown's letter opining Plaintiff could not maintain employment (Tr. 694-95)
- May 2011   Ms. Garland/Dr. May evaluation and opinion   marked limitations in dealing with people, adapting to a work routine and changes at work; moderate or mild limitations in other areas (Tr. 713-19)
- May 2011   Dr. Kupstas record review   moderate limitations in some areas (Tr. 729-46)
- February 2012   Dr. Hamilton-Lockwood evaluation and opinion   GAF score of 65-70 and mild limitations in most areas  (Tr. 762-77)

The ALJ gave weight to various opinions as follows.  He gave great weight to the opinions of state agency psychologists who reviewed Plaintiff's file (Dr. Jessee and Dr. Kupstas), stating that these opinions were consistent with his RFC determination (Tr. 412).  The ALJ further stated, however, that he disagreed with the part of these opinions indicating moderate limitations

in activities in daily living because Plaintiff's stated daily activities indicated only mild restrictions (Tr. 412). He gave some weight to the opinion of Ms. Abbott and Dr. Stanley, explaining that Ms. Abbott's significant limitations in social interaction and general adaptation were not supported by her objective findings or other evidence (Tr. 411-12). Specifically, Plaintiff was oriented, cooperative, and conversational on examination; his mood was moderately depressed but he could attend, concentrate and follow directions; he could manage his own resources; he had a GAF of 54, which indicated moderate impairment; and his treatment notes from Cherokee Health indicated his symptoms were maintained with therapy and over-the-counter medications (Tr. 412). The ALJ gave little weight to the opinions of Ms. Brown, stating that they were not consistent with the overall evidence in the record, including Plaintiff's participation in the vocational rehabilitation program, treatment notes from Cherokee Health indicating Plaintiff's symptoms were generally controlled with therapy and over-the-counter medications, moderate GAF scores, no prior hospitalizations for mental health issues, and Plaintiff's reported daily activities (Tr. 412). The ALJ gave little weight to the opinion of Ms. Garland and Dr. May for essentially the same reasons outlined in his discussion of Ms. Brown's opinion (Tr. 413). Finally, the ALJ noted he was giving great weight to the opinion of Dr. Lockwood because it was generally consistent with the RFC determination (Tr. 413).

Just as with the opinion evidence as to Plaintiff's physical impairments, on remand, the ALJ discussed each opinion related to Plaintiff's mental health and assessed the opinions various weight. When an opinion was not afforded much weight, the ALJ provided reasons for that decision. I therefore **FIND** the ALJ properly complied with the instructions given him on remand as to the mental health opinion evidence and **CONCLUDE** the ALJ addressed all of the opinion evidence adequately as directed on remand.

1.      **RFC Determination**

The Appeals Council order also directed the ALJ to give further consideration to Plaintiff's RFC and provide appropriate rationale with specific references to the evidence supporting the limitations (Tr. 479). The ALJ extensively summarized the evidence in the record before stating the following with regard to Plaintiff's RFC:

> In terms of the claimant's alleged back pain, the record shows that the claimant received only minimal treatment for such complaints. While x-rays of the lumbar spine showed disc space narrowing at L5-S1, examinations showed that the claimant had full range of motion of the thoracolumbar spine and hips, negative straight leg raising, 5/5 strength, and normal gait and station. The undersigned notes that the claimant has not sought more aggressive treatment such as physical therapy, referral to a specialist or surgeon, or referral to a pain clinic. Due to his back disorder, the undersigned finds that the claimant has the residual functional capacity to perform medium work activity except he is limited to frequent postural activities except never climbing ropes, ladders, or scaffolds; he is limited to work which does not involve concentrated exposure to extreme heat, extreme cold, vibration, or hazards; and he is limited to work that does not require driving.
> . . .
> While the claimant has received treatment for his mental impairments, the undersigned notes that the claimant's symptoms appear to be generally maintained with individual therapy and over-the-counter medications. The undersigned notes that the claimant has not required psychiatric hospitalization for a severe mental disorder at any time during the period at issue, Although the claimant has received treatment for his mental impairments since October 2005, he was able to complete a Work Adjustment Program with Goodwill Industries in November 2007 and was noted to have developed good [sic] attendance record. He was also noted to have developed and obtained a good production rate and proved to be capable to appropriate interpersonal skills. Due to his mental impairments, the undersigned finds that the claimant is limited to simple, routine, repetitive jobs and is better with things rather than people. In describing his activities of daily living, the claimant reported that he drove, did some outside work, went to the store, took his children to school and picked them up from the bus stop, took his children to ballet practice or where ever they needed to go, cared for his pet, watched television, watched movies, used the computer, worked on his house, organized his

> tools, visited a neighbor, had friends, did carpentry and car repairs,
> went to the grocery store, managed his bills, chopped firewood,
> and laid flooring.  The undersigned finds that these activities are
> consistent with the above residual functional capacity.

(Tr. 409-10).  The ALJ further noted that Plaintiff's migraine headaches and history of amblyopia were accounted for in his physical RFC limitations (Tr. 409).

As a preliminary matter, I **FIND** the ALJ complied with the instructions on remand and discussed the reasons for reaching his RFC determination with reference to evidence in the record.  As to the substantive RFC determination, which Plaintiff also challenges, I **FIND** the ALJ extensively reviewed the evidence in the record spanning a significant time period, reviewed over a dozen opinions indicating a variety of physical and mental limitations, and solicited Plaintiff's testimony at the hearing before reaching his conclusion.  I **CONCLUDE** the ALJ's determination as to Plaintiff's physical impairments is supported by substantial evidence as discussed above, as all of the evidence in the record is generally consistent with the ALJ's physical RFC determination.

Plaintiff argues at greater length that his mental impairments render him disabled and the ALJ's mental RFC determination is flawed.  Assessing Plaintiff's mental health impairments is somewhat challenging from this record because the opinions run the gamut from Plaintiff having mild limitations due to his mental health impairments, to being significantly limited and unable to maintain employment.  The most mild of the opinions comes from an examining psychologist, while the most extreme comes from Plaintiff's treating therapist.  In the middle are opinions by state agency psychologists who reviewed Plaintiff's file and examining psychologists who all opined some level of primarily moderate limitations, with a few exceptions in areas where more significant limitations were noted, although there is rarely agreement among the opinions as to the areas where Plaintiff has more significant limitations.  It is important to note, however, that

there are no opinions in the record from a treating psychologist or psychiatrist who would qualify as an acceptable medical source.[5] In addition to the wide variety of opinions, Plaintiff's diagnoses and any resulting limitations have been something of a moving target over the seven plus years of mental health treatment in the record.

What is apparent from the record, however, is that Plaintiff never had mental health problems that required hospitalization; resulted in any ongoing suicidal or homicidal thoughts; or were severe enough to warrant strong recommendations or extreme encouragement to take anti-depressants even considering Plaintiff's problems with side effects. Most of Plaintiff's treatment notes indicate ups and downs with depression caused by situational factors, such as family and financial stressors. Although Plaintiff agreed to try an anti-depressant once or twice, he was generally opposed to taking medication for his mental health problems due to side effects, but over several years of treatment, he did not try more than, at most, two or three different medications for brief periods before reaching this conclusion. Instead, Plaintiff treated his conditions with herbal remedies and therapy.

Moreover, in assessing the opinions in the record, it is important to note that with respect to Ms. Brown's opinions, which indicate the most extreme limitations, none of her treatment records for Plaintiff are in the record after September 2009, when she left Cherokee Health (Tr. 680, 694-95). Therefore, the ALJ had no treatment notes to provide context for her opinion in March 2010 and her letter of March 2011 and, as for her 2008 opinion, it was during the same time period in which two state agency psychologists opined Plaintiff had moderate limitations and during which Plaintiff reported some improvement in his mood and mood swings. Overall, the record reflects several GAF scores indicating moderate impairments (and one on the cusp of

---

[5] Acceptable medical sources are defined in 20 C.F.R. § 416.913(a) and 20 C.F.R. § 404.1513(a) to include licensed physicians and licensed psychologists.

moderate and severe), therapy documenting mostly mild to moderate ups and downs in Plaintiff's mood and ability to function, some of which was seasonal, and essentially no extreme or severe mental health episodes.

Although Plaintiff argues that the ALJ found moderate impairments in concentration, persistence and pace but did not account for these in the RFC pursuant to *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010), I note that in determining whether any of Plaintiff's impairments met or equaled a Listing, the ALJ undertook an analysis of the "paragraph B" criteria, which determine the severity of impairments in four areas—activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. Paragraph B of the mental health listings at issue requires two of the following: marked limitations in any of the first three categories, and repeated episodes of decompensation. The ALJ found Plaintiff had mild restrictions in his activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence and pace, and no episodes of decompensation (Tr. 407-08). The ALJ specifically noted, however, that "[t]he limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process" (Tr. 408). As for Plaintiff's argument with respect to *Ealy*, the ALJ did not determine Plaintiff had moderate limitations in concentration, persistence and pace in fashioning his RFC, and the proposition that simple, routine, repetitive tasks does not account for such limitations does not apply. *See Ealy*, 594 F.3d at 516-17. Instead, the ALJ gave great weight to most of the opinion of Dr. Jessee and Dr. Kupstas and great weight to the opinion of Dr. Hamilton-Lockwood. These opinions, coupled with Plaintiff's treatment notes and GAF scores, provide substantial support for the ALJ's determination that Plaintiff was somewhat more limited in

concentration, persistence and pace and social functioning than in other areas, and provide

support for the ALJ's RFC determination that Plaintiff should be limited to simple, routine,

repetitive tasks and should work with things rather than people.

Finally, in terms of compliance with the remand order as it pertains to Plaintiff's RFC,

Plaintiff is correct in stating that *Drummond* does not apply to this claim, as the Appeals Council

vacated the ALJ's prior decision upon remand. *See Wireman v. Comm'r of Soc. Sec.*, 60 F.

App'x 570, 571 (6th Cir. 2003) (noting that *Drummond* applies to final decisions and stating

"[t]he only final decision in this case is the . . . decision which is now before this court. All other

decisions relevant to [plaintiff's] social security disability insurance benefits never became final

as they were vacated pursuant to remands for further proceedings."); *Anderson v. Astrue*, 2:07-

CV-140, 2009 WL 32935, at *3-4 (E.D. Tenn. Jan. 6, 2009) (citing *Wiseman* and noting a prior

decision was vacated by the Appeals Council, such that there was no final decision binding the

ALJ). It does not appear, however, that the ALJ relied upon *Drummond* in making his decision

or, if he did, that this constituted error requiring remand. The ALJ noted as follows:

> The undersigned has considered the <u>Drummond</u> Acquiescence
> Ruling in arriving at the claimant's current residual functional
> capacity. The [ALJ] notes that the current residual functional
> capacity is supported by the overall evidence of record and is
> generally consistent with the prior [ALJ's] residual functional
> capacity. While the claimant was previously found to be limited to
> work which required less than perfect vision, the undersigned finds
> that, due to his history of amblyopia, the claimant has the residual
> functional capacity to perform work except he is limited to work
> which does not involve concentrated exposure to hazards and he is
> limited to work that does not require driving. The undersigned
> notes that this is supported by the opinion of Dr. Brooks.

(Tr. 413).

It is unclear whether the ALJ felt he was bound by the prior RFC determination, as it did

change from the prior decision, but in any event, it is clear the ALJ extensively reviewed all the

medical evidence in the record, including a significant amount of new evidence, before reaching his RFC determination. While Plaintiff's RFC is not significantly different from his prior RFC, the new evidence in the record does not indicate any significant changes in Plaintiff's physical or mental health and, given the wealth of information in the record, any such changes would no doubt have been documented. As such, after reviewing the remand order, the evidence in the record, and the ALJ's decision, I **CONCLUDE** the ALJ's RFC determination as to Plaintiff's mental impairments is supported by substantial evidence.

### 2. VE Testimony

Plaintiff's final argument concerns the reliance on VE testimony, as the remand order directed the ALJ to solicit VE testimony with an appropriate hypothetical and examples of jobs available and the incidence of such jobs in the national economy; the ALJ was further directed to ensure there were no conflicts between the VE testimony and the Dictionary of Occupational Titles ("DOT") (Tr. 479-80). A VE's testimony in response to a hypothetical is substantial evidence regarding the existence of jobs that the claimant can perform as long as the hypothetical question "accurately portrays [her] individual physical and mental impairments." *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). The hypothetical need not include all the claimant's diagnoses, but should merely reflect the claimant's RFC (as previously determined by the ALJ) as well as her vocational factors of age, experience, and education. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). The VE need not identify multiple jobs to establish a "significant number" of jobs in the national economy. *See Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578-79 (6th Cir. 2009).

Here, the ALJ first asked the VE to assume an individual who could perform medium work with frequent posturals but no ropes, ladders, or scaffolds; avoiding concentrated exposure

to extreme heat and cold, vibrations, and hazards; no driving; simple, routine, repetitive tasks; and working with things rather than people (Tr. 432). The VE testified there would be 1,408,895 such jobs nationally and 33,474 regionally, which would need to be reduced by 40 percent to account for Plaintiff's non-exertional limitations (Tr. 432). Examples of such jobs available would be dishwasher, janitor, houseman, and grounds maintenance (Tr. 432). The ALJ further asked the VE if his testimony was consistent with the DOT, and he stated it was (Tr. 433). Reducing the number of medium jobs identified by 40 percent would result in over 20,000 jobs regionally and over 800,000 nationally. The ALJ also asked the VE to provide examples of light and sedentary jobs with the same restrictions, and with the percentage reductions opined by the VE to account for the additional limitations, there would be over one million nationally and over 25,000 regionally for light work and over 130,000 nationally and approximately 2,700 for sedentary work (Tr. 432-33).

I have already found the ALJ's RFC determination was supported by substantial evidence, and the ALJ's hypothetical reflected this RFC and properly encompassed Plaintiff's mental and physical limitations. Although Plaintiff alleges the VE testifying to a group of jobs reduced by a percentage did not comply with the order remanding Plaintiff's claim, Plaintiff provides no support for this argument, the Appeals Council order does not specify that this would be inappropriate, and Plaintiff does not argue the jobs identified are not in significant numbers or do not reflect the limitations in the hypothetical question. I **FIND** the VE provided examples of jobs in significant numbers relevant to the hypothetical and I further **FIND** the ALJ complied with the remand order in his solicitation of VE testimony. Additionally, I **CONCLUDE** the ALJ properly relied upon VE testimony as substantial evidence that jobs existed in significant numbers in the national economy which Plaintiff could perform and, after

considering all Plaintiff's arguments, I **CONCLUDE** the decision of the ALJ is supported by substantial evidence.

## V. CONCLUSION

Having carefully reviewed the administrative record and the Commissioner's arguments, I **RECOMMEND**[6] that:

1) Plaintiff's motion for judgment on the pleadings [Doc. 11] be **DENIED**.

2) The Commissioner's motion for summary judgment [Doc. 13] be **GRANTED.**

3) The Commissioner's decision denying benefits be **AFFIRMED.**

SO ORDERED.

ENTER:

s/ *Susan K. Lee*
_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[6] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).